# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-KA-01615-COA

**RODNEY MONTAE PETTUS A/K/A RODNEY PETTUS A/K/A RODNEY M. PETTUS**                          **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                          **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 10/17/2018 |
| TRIAL JUDGE: | HON. LESTER F. WILLIAMSON JR. |
| COURT FROM WHICH APPEALED: | KEMPER COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: JUSTIN TAYLOR COOK |
| | GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: SCOTT STUART |
| DISTRICT ATTORNEY: | KASSIE ANN COLEMAN |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 05/05/2020 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CARLTON, P.J., FOR THE COURT:**

¶1.     A Kemper County Circuit Court jury convicted Rodney Pettus of burglary of a building other than a dwelling, and the trial court sentenced him to serve twenty-five years in the custody of the Mississippi Department of Corrections (MDOC) without eligibility for parole or probation.  On appeal, Pettus argues that the trial court erred in performing an incomplete *Batson*[1] analysis and in limiting Pettus's right to cross-examine his co-indictee.

---

[1] *Batson v. Kentucky*, 476 U.S. 79, 89 (1986).

¶2.     After our review, we find no error.  We therefore affirm Pettus's conviction and sentence.

**FACTS**

¶3.     In March 2016, Sid McCoy called 911 to report a burglary at his uncle's house. According to McCoy, his uncle had recently passed away, so McCoy went to check on the house and feed the cats.  When McCoy arrived at his uncle's house, he discovered that someone had broken into the utility shed in the backyard.  McCoy explained that the shed door "was busted wide open . . . and some of the items were gone."

¶4.     Investigator Michael Mattox of the Kemper County Sheriff's Department investigated the burglary. During the course of his investigation, Investigator Mattox accessed a police-only database for pawned or scrapped items, and he discovered that a person named Tommy Stewart had pawned three items that were suspected to have been stolen from the shed.  After speaking with Stewart, Investigator Mattox developed four possible suspects, including Pettus.

¶5.     Pettus was arrested and indicted for burglary of a building other than a dwelling pursuant to Mississippi Code Annotated section 97-17-33 (Rev. 2014).  At a trial held on July 24-25, 2018, the jury heard testimony from Stewart as well as two of Pettus's co-indictees: Tommy Adams and Jemario Elmore.[2]  The jury found Pettus guilty of burglary of a building other than a dwelling.  The trial court sentenced Pettus as a habitual offender under Mississippi Code Annotated section 99-19-81 (Rev. 2015) to serve twenty-five years in the

---

[2] The transcript reflects that both the State and defense declined to call Tamodre Chamberlain, a co-indictee, as a witness at trial.

custody of the MDOC without eligibility for parole or probation. The trial court also ordered Pettus to pay court costs and fines in the amount of $2,430.50.

¶6.     Pettus filed a motion for judgment notwithstanding the verdict or, in the alternative, a new trial, which the trial court denied. This appeal followed.

## DISCUSSION

### I.     *Batson* Challenge

¶7.     Pettus asserts that the trial court erred in performing an incomplete *Batson* analysis when the trial court declined to engage in the required third part of the test—an inquiry into potential pretext of the State's purported race-neutral reasons for exercising its peremptory strikes on only black members of the venire.

¶8.     To "safeguard against racial discrimination in jury selection," the United States Supreme Court set forth the following three-step process:

> First, the party objecting to the use of a peremptory strike has the burden to make a prima facie case that race was the criterion for the strike. Second, if the objecting party makes such a showing, the burden shifts to the striking party to state a race-neutral reason for the strike. Third, after the striking party offers its race-neutral explanation, the court must determine if the objecting party met its burden to prove purposeful discrimination in the exercise of the peremptory strike—that the stated reason for the strike was merely a pretext for discrimination.

*H.A.S. Elec. Contractors Inc. v. Hemphill Const. Co.*, 232 So. 3d 117, 123 (¶14) (Miss. 2016) (citing *Pitchford v. State*, 45 So. 3d 216, 224 (¶14) (Miss. 2010)) (footnote omitted). "Peremptory strikes may not be used for the purpose of striking jurors based solely on their race or gender." *Lewis v. State*, 239 So. 3d 1097, 1099 (¶6) (Miss. Ct. App. 2018).

¶9.     When reviewing a trial court's ruling on a *Batson* challenge, we use "great deference

3

because finding the striking party engaged in discrimination is largely a factual finding." *Id*. (internal quotation mark omitted). "The trial judge acts as finder of fact when a *Batson* issue arises." *Allen v. State*, 235 So. 3d 168, 171 (¶7) (Miss. Ct. App. 2017). "We will not overrule a trial court on a *Batson* ruling unless the record indicates that the ruling was clearly erroneous or against the overwhelming weight of the evidence." *Id*.

¶10. The record reflects that the State used its peremptory strikes on five jurors: Juror 1, Juror 5, Juror 6, Juror 7, and Juror 22. After the State made five peremptory strikes, defense counsel raised a *Batson* challenge to all five strikes and asserted as follows: "I hate to do this, but I'm going to make a *Batson* challenge. All five jurors that the State has struck are black, and all except for one are black females. And one, two, three of them gave no response according to my notes." The trial court responded: "I'm not sure that there's a presumption of bias. However, if you're willing to put that on the record considering the nature of the case, I think it would be prudent to do so." The trial court then asked the State if it had "race-neutral reasons for all of the State's strikes."[3]

¶11. The State informed the trial court that it was prepared to respond to Pettus's *Batson* challenges and the State proceeded to set forth its race-neutral reasons for the strikes. With

---

[3] In his appellate brief, Pettus asserts that after defense counsel made the *Batson* challenge, the trial court made no finding of a prima facie case and immediately went to requiring the State to present race-neutral reasons for its strikes. Pettus acknowledges, though, that "where the trial court does not explicitly rule on whether the defendant established a prima facie case under *Batson* but nevertheless requires the opposing party to provide race-neutral reasons for its challenges and the opposing party provides reasons for its challenges the issue of whether the challenging party established a prima facie case is moot." *Perry v. State*, 949 So. 2d 764, 767 (¶6) (Miss. Ct. App. 2006) (quoting *Lynch v. State*, 877 So. 2d 1254, 1271 (¶48) (Miss. 2004)).

4

respect to Juror 1, the State explained, "[A]s [defense counsel] pointed out, [Juror 1] actually gave absolutely no comment." The State asserted that Juror 1 yawned and stared at the wall, which made the State "feel like she was [not] listening or paying attention, or maybe she just didn't like me."

¶12. As to Juror 5, the State explained that his juror questionnaire was incomplete and that his father was serving time in jail based on a conviction in Lauderdale County. According to the State, when Juror 5 was asked if he felt like the State treated his father fairly, he responded, "I don't know."

¶13. The State then submitted that Juror 6's son was also serving time in jail and when asked, Juror 6 stated that she did not think that her son was treated fairly by the State in that conviction.

¶14. Next, the prosecutor asserted that she struck Juror 7 based on information she received from law enforcement; namely, that Juror 7 "was known in the community to drink a lot" and that law enforcement "would be surprised if she's not drinking right now." The State also submitted that Juror 7 did not respond to any questions and that she was not maintaining eye contact, but the State admitted that Juror 7 may have just suffered from an eye issue. The trial court added that based on Juror 7's last name, "she most clearly has got some relatives that have been convicted of felonies."

¶15. As for Juror 22, the prosecutor explained that she had recently tried four different defendants with the same last name as Juror 22: two of the defendants were tried for armed robbery, and the other two were tried for grand larceny. The State explained that it did not

want to risk that Juror 22 may be related to one of the prior defendants it prosecuted. The prosecutor admitted that when she asked law enforcement about Juror 22, they responded that they did not know her or know whether she was married to anyone related to the prior defendants.

¶16.    After the State provided its race-neutral reasons, the trial court asked defense counsel, "[D]o [y]ou want to argue on those issues . . . ?" Defense counsel responded, "No, your Honor. My concern was just the ones that didn't respond." The trial court then found that the State explained race-neutral reasons appropriately and overruled defense counsel's *Batson* challenges, stating that it would allow the peremptory strikes.

¶17.    Pettus acknowledges that trial court accepted the State's race-neutral reasons for its peremptory strikes, but he argues that the trial court did not then undertake its duty to perform *Batson*'s third step and determine whether the facially valid reasons offered were pretext for purposeful discrimination.

¶18.    The Mississippi Supreme Court has held that "when—as here—the party offers a valid race-neutral reason, the trial judge must allow the strike unless the other party demonstrates that the valid race-neutral reason was a pretext for discrimination." *Hardison*, 94 So. 3d 1092, 1100 (¶28) (Miss. 2012); *see also Watts v. State*, 281 So. 3d 873, 879 (¶12) (Miss. Ct. App. 2019). However, in the case before us, Pettus did not claim at trial that the State's reasons were pretext for discrimination; instead, Pettus makes that claim for the first time on appeal. As stated above, when the trial court asked defense counsel if she wanted to make an argument regarding the State's race-neutral reasons, defense counsel responded: "No, your

6

Honor. My concern was just the ones that didn't respond." Pettus, as the opponent of the strike, bears the burden "to show that the race-neutral explanation given is merely a pretext for racial discrimination." *Pruitt v. State*, 986 So. 2d 940, 943 (¶8) (Miss. 2008). "[W]hen the objecting party [(Pettus)] offers no rebuttal, the court is forced to examine only the reasons given by the striking party [(the State)]." *H.A.S. Elec. Contractors*, 232 So. 3d at 125 (¶24).

¶19. In *H.A.S. Electrical Contractors*, the objecting party "made absolutely no attempt to meet its burden to prove [the striking party's] reason for striking Juror 13 was pretextual." *Id*. The supreme court found no error in the trial court's *Batson* analysis as to this juror, explaining that because the objecting party did not meet its burden of showing pretext, "no further examination for pretext was required" by the trial court. *Id*. at (¶¶25-26); *see also Pitchford*, 45 So. 3d at 227 (¶30) (When an objecting party provided no rebuttal to the State's race-neutral reasons, the supreme court held that "[w]e will not now fault the trial judge with failing to discern whether the State's race-neutral reasons were overcome by rebuttal evidence and argument never presented.").

¶20. We further recognize that in *Batson*, the United States Supreme Court "did not articulate a particular means of accomplishing the third step." *Pruitt*, 986 So. 2d at 946 (¶20). In *Pruitt*, the supreme court quoted a case rejecting a requirement that the trial court must make specific findings of fact regarding the race-neutral reasons: "[a]s long as a trial judge affords the parties a reasonable opportunity to make their respective records, he may express his *Batson* ruling on the credibility of a proffered race-neutral explanation in the

7

form of a clear rejection or acceptance of a *Batson* challenge." *Id*. (quoting *Messiah v. Duncan*, 435 F.3d 186, 198 (2nd Cir. 2006)); *see also Corrothers v. State*, 148 So. 3d 278, 306 (¶68) (Miss. 2014) (finding that "the trial court's failure to articulate specific findings in its ruling on the State's race-neutral reasons is not reversible error"); *Mootye v. State*, No. 2016-KA-01016-COA, 2019 WL 2352311, at *9 (¶39) (Miss. Ct. App. June 4, 2019), *cert. denied*, 287 So. 3d 216 (Miss. 2020).

¶21.     Here, the record reflects that the trial court found the State's race-neutral reasons credible based on the trial court's rejection of Pettus's *Batson* challenge—thus accomplishing the third step of the *Batson* analysis. *Pruitt*, 986 So. 2d at 946 (¶20). We find that the trial court's denial of Pettus's *Batson* challenge was not clearly erroneous or against the overwhelming weight of the evidence, and we accordingly affirm the trial court's ruling on this issue. *See Allen*, 235 So. 3d at 171 (¶7).

**II.     Cross-Examination of Tommy Adams**

¶22.     Pettus next argues that the trial court erred in granting the State's motion in limine that prevented Pettus from questioning Adams, his co-indictee, about Adams's subsequent criminal activity. Pettus asserts that this error violated his right to fully confront the witnesses against him and his right to assert a theory of defense.

¶23.     The record reflects that in the present case, Adams and Pettus were both indicted for burglary of a building other than a dwelling. Adams pleaded guilty to the lesser-included offense of grand larceny. Adams was later indicted for burglary of a dwelling on a separate and unrelated charge. Prior to Adams's testimony in Pettus's case, the State made an ore

8

tenus motion in limine requesting the trial court to exclude any reference before the jury to Adams's prior convictions. The State informed the trial court that Adams did not currently have any agreement with the State regarding his recent, pending burglary charge.

¶24. Defense counsel objected and argued that the State opened the door to questioning Adams about his convictions when the State presented to the jury the theory that none of Pettus's co-indictees had been in trouble before or after the circumstances surrounding the present case. The trial court asked defense counsel how a crime Adams allegedly committed after breaking into the shed with Pettus would be an indicator of his state of mind at the time he broke into the shed. Defense counsel responded that it was relevant because the State had asked the other co-indictees if they had been in trouble since the burglary of the shed. The State reminded defense counsel that she had not asked Adams whether he had been in trouble since the burglary of the shed.

¶25. The trial court granted the State's motion in limine and ruled that "unless Adams indicates that he's had no other criminal contact before or after this," then the prejudice of allowing testimony regarding a subsequent pending charge would outweigh the probative value.

¶26. During cross-examination of Adams, defense counsel asked Adams, "And you're not the type of person that would break into a shed?" Adams answered, "No, ma'am." Defense counsel then asked the trial court to reconsider its ruling on the State's motion in limine. The State objected, and the trial court sustained the State's objection, explaining, "My ruling is not going to change. I'm not going to allow you to lead him into giving testimony . . . there

9

and take advantage of him in this case." Defense counsel argued that Pettus has the right to fully cross-examine the witnesses against him. The trial court stated, "I think you've done that," and it declined to revisit its prior ruling.

¶27. Pettus argues that questioning Adams regarding his pending charges for other burglaries was Pettus's attempt to assert his theory of defense: that he was not guilty of burglary. Pettus claims that questioning Adams about his pending charges for other burglaries would also simultaneously rebut the State's theory that Pettus had served as a ring-leader for the young and impressionable co-indictees. Pettus further claims that Adams's testimony opened the door for further questioning involving his alleged criminal activity.

¶28. We recognize that "the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Ambrose v. State*, 254 So. 3d 77, 100 (¶52) (Miss. 2018), *cert. denied*, 139 S. Ct. 1379 (2019). Additionally, a person "accused of a crime has the right to broad and extensive cross-examination of the witnesses against him, and especially is this so with respect to the principal prosecution witness." *Id*. at 101-02 (¶56). "The right is secured by our rules of evidence, namely [Mississippi] Rule [of Evidence] 611(b), and it is a function of the Confrontation Clauses of the federal and state constitutions." *Id*. The supreme court has held that "[t]he trial court generally is allowed wide discretion concerning the admission of evidence offered to suggest bias on the part of a witness against the defendant." *Id*. at 100 (¶50). "An abuse of discretion will be found only where the defendant shows clear prejudice resulting from undue restraint on the

10

defense." *Cage v. State*, 149 So. 3d 1038, 1044 (¶13) (Miss. 2014).

¶29. Regarding evidence of a witness's character, Mississippi Rule of Evidence 404(a)(3) states that "[e]vidence of a witness's character may be admitted under Rules 607, 608,[4] and 609."[5] M.R.E. 403(a)(3). Under Mississippi Rule of Evidence 607, "[a]ny party, including the party that called the witness, may attack the witness's credibility." M.R.E. 607.

¶30. "Mississippi Rule of Evidence 611(b) allows wide open cross-examination of witnesses, and [Mississippi] Rule [of Evidence] 616 allows evidence of bias for the purpose

---

[4] Mississippi Rule of Evidence 608 provides that specific instances of conduct of a witness may be inquired into on cross-examination to attack the credibility of the witness if the specific instances of conduct are probative of the witness's character for truthfulness or untruthfulness. M.R.E. 608(b). The supreme court has clarified, however, that "if the past conduct did not involve lying, deceit, or dishonesty in some manner, it cannot be inquired into on cross-examination." *Hickman v. State*, 73 So. 3d 1156, 1160 (¶16) (Miss. 2011). This Court has held that "the crime of burglary is not generally considered to be a crime weighing sufficiently on truth and veracity." *Malone v. State*, 829 So. 2d 1253, 1260 (¶20) (Miss. Ct. App. 2002). In *Singleton v. State*, 948 So. 2d 465, 469-70 (¶¶6-7) (Miss. Ct. App. 2007), this Court held that a witness's "pending charge for grand larceny alone was not probative of his general truthfulness or untruthfulness" and found that the trial court did not abuse its discretion in prohibiting the defense from impeaching the witness by showing that he had recently been convicted of grand larceny. Accordingly, Rule 608 is not applicable in the present case. In his appellate brief, Pettus also agrees that "this is not an instance where Miss. R. Evid. 608's 'character for truthfulness' of a witness is applicable."

[5] We also recognize that Mississippi Rule of Evidence 609 "restricts impeachment of a witness's character for truthfulness with prior criminal conduct to only conduct that has resulted in a conviction." *Ambrose*, 254 So. 3d at 100 (¶48); *see also Johnston v. State*, 618 So. 2d 90, 93 (Miss. 1993). In the present case, Adams and Pettus were both indicted for burglary of a building other than a dwelling. Adams pleaded guilty to grand larceny, and as part of his plea deal, Adams agreed to testify against Pettus. The record also reflects that Adams was later indicted for burglary of a dwelling on a separate and unrelated charge. Regarding this latter indictment for the separate charge of burglary of a dwelling, the State informed the trial court that at the time Adams accepted his plea deal for grand larceny, Adams "did not know he was going to have new charges pending by the time trial came around." Because Adams's pending indictment does not constitute a conviction, Rule 609 does not apply to the present case.

of attacking the credibility of a witness." *Ambrose*, 254 So. 3d at 101 (¶53). Stated differently, while Rule 609 goes to the truthfulness and veracity of a witness, Rule 616 is concerned with a witness's bias for or against a party. The supreme court has explained that "[f]or purposes of attacking the credibility of a witness under Rule 616, evidence of bias, prejudice, or interest of the witness includes interrogating the witness's belief or perception as to whether the State could extend leniency for pending charges." *Id*. (internal quotation mark omitted). "Evidence that a material witness has received favored treatment at the hands of law enforcement authorities, particularly where that witness is himself subject to prosecution, is probative of the witness's interest or bias and may be developed through cross-examination or otherwise presented to the jury." *Id*. at 102 (¶56). Additionally, "[f]or evidence of bias or interest to be admissible under Rule 616, it must have the tendency, in the case being tried, to make the facts to which the witness testified less probable than they would be without the evidence of bias." *Robinson v. State*, 247 So. 3d 1212, 1225 (¶25) (Miss. 2018) (internal quotation mark omitted). The admissibility of such evidence is limited by Rule 403, which states that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." M.R.E. 403; *see Batiste v. State*, 121 So. 3d 808, 863 (¶143) (Miss. 2013) ("Rule 403 is an ultimate filter through which all otherwise admissible evidence must pass.").

¶31. In *Scott v. State*, 796 So. 2d 959, 964 (¶17) (Miss. 2001), the supreme court held that

12

the trial court did not err in prohibiting the defendant from cross-examining a witness about pending indictments against her. In that case, the defendant "was allowed to question [the witness] regarding her prior convictions, but not about whether there were any pending indictments against [the witness]." *Id*. at 961 (¶6).

¶32. However, the supreme court "has emphasized that a material witness's favored treatment from law enforcement authorities when the witness is subject to prosecution is probative of the witness's interest or bias and may be developed through cross examination." *Ambrose*, 254 So. 3d at 101 (¶55). The supreme court has "specifically . . . held that 'a leniency/immunity agreement may be presented to the jury where such would tend to impeach or show bias in the testimony of a State's witness.'" *Id*. at 102 (¶56) (quoting *Barnes v. State*, 460 So. 2d 126, 131 (Miss. 1984)). The State must disclose any witness leniency or immunity agreements to the defense. *Id*.

¶33. In the recent case of *Ambrose*, the defendant appealed his conviction of capital murder and argued that the trial court unconstitutionally and prejudicially prevented him from confronting and impeaching the State's witness, who was also an uncharged co-participant in the crime "with evidence highly probative of [the witness's] bias in favor of testifying in the manner desired by the State." *Id*. at 98 (¶41). Upon review, the supreme court found that the record failed to show "a leniency or immunity agreement had been struck" with the witness and the State as to the witness's nonadjudicated burglary or arrest for armed robbery. *Id*. at 102 (¶57).

¶34. However, the supreme court acknowledged that the witness was on probation at the

13

time of trial, and "it is undisputed that [the witness] was subject to revocation at the time of his interview [with the investigator] and for some time thereafter." *Id*. The supreme court also acknowledged that "although [the witness's] armed robbery charge was no true billed, he remained subject to have the armed robbery charge presented to the grand jury again." *Id*. at 102-03 (¶60). The supreme court recognized that questioning a witness for the prosecution about separate, unrelated pending criminal charges "has been allowed for purposes of showing motivation to testify." *Id*. at 103 (¶63) (citing *Hall v. State*, 476 So. 2d 26, 28 (Miss. 1985)). The supreme court ultimately held that although the witness's "testimony was not necessary to finding [the appellant] guilty of capital murder beyond a reasonable doubt, . . . under the heightened scrutiny standard of review, the trial court [still] erred by excluding the evidence." *Id*. The supreme court explained that "[b]y limiting [the defendant's] cross examination of [the witness], the trial court denied [the defendant] the opportunity to fully challenge [the witness's] credibility." *Id*.

¶35. As stated, the admissibility of evidence is limited by Rule 403, which provides that "the court may exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." M.R.E. 403. In *Ambrose*, the supreme court recognized that although "the evidence may have been properly excluded under Rule 403, the trial court did base its decision to exclude the evidence on Rule 403"; rather, "the trial court erroneously concluded that the evidence of bias was not relevant[.]" *Id*. at 104-05 (¶68). However, the supreme

14

court "decline[d] to conduct a Rule 403 balancing analysis for the first time on appeal," and the supreme court instead reviewed the issue for harmless error. *Id.* at 105 (¶¶68-69).

¶36. We recognize that "even errors involving a violation of an accused's constitutional rights may be deemed harmless beyond a reasonable doubt where the weight of the evidence against the accused is overwhelming." *Id.* at (¶70). When determining whether a constitutional error is harmless, we must examine "whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.* (internal quotation marks omitted). The supreme court has held that "[t]he constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other Confrontation Clause errors, is subject to harmless error analysis":

> [t]he correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness's testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Id.* (quoting *Clark v. State*, 891 So. 2d 136, 142 (¶29) (Miss. 2004)). The supreme court observed that several other witnesses to the crime testified at trial as to the defendant's role in the murder. *Id.* at 105-06 (¶¶71-73). The supreme court ultimately concluded that the trial court's error of excluding cross-examination regarding the witness's criminal past "was harmless beyond a reasonable doubt" because even without the witness's testimony, "[the defendant]'s guilt was proven beyond a reasonable doubt." *Id.* at 106 (¶73).

15

¶37. Turning to the case before us, we find that as in *Ambrose*, Pettus "did not argue at the trial level or in its initial brief on appeal that the State had failed or refused to disclose a leniency or immunity deal to the defense[.]" *Id*. at 102 (¶57). In fact, in the case before us, the State informed the trial court that Adams did not currently have any agreement with the State regarding his recent pending burglary charge, explaining, "Clearly, we have not made a plea arrangement with him because I didn't even know those charges were pending."

¶38. The trial transcript further reflects that Pettus's argument regarding cross-examination of Adams on the pending charge was not based on Rule 616, nor did Pettus argue that cross-examination was necessary to show the jury that Adams was biased in favor of testifying in the manner desired by the State. Rather, Pettus's argument at trial centered around discrediting the State's theory that Pettus was the criminal mastermind behind the crime and that he encouraged the younger co-participants to commit the crime. As stated, Pettus challenged the State's motion in limine to exclude any reference before the jury to Adams's pending charges. The State argued that unless there was a plea agreement in place to resolve a witness's pending charges or indictments in exchange for testifying at trial, then a witness's separate, unrelated pending charges were not relevant. The defense responded that the State "opened the door" to cross-examining Adams on these pending charges by presenting to the jury the theory that Pettus encouraged the younger co-participants to commit the charged crime. The defense asserted that by cross-examining Adams about the pending charge, "it takes away from [the State's] theory of the case[,] which is that [Pettus] was some criminal mastermind and encouraged these boys to commit this crime."

16

¶39. The transcript reflects that at trial, the trial court inquired as to the existence of any leniency or immunity deal as to Adams's pending charge. The trial court acknowledged that when it accepted Adams's guilty plea to grand larceny, the trial court "sentenced him to five years, five years suspended, five years probation." The trial court then questioned Adams's attorney about the circumstances surrounding the pending charge. The trial court observed that at the time of trial, Adams was still on probation, and the trial judge asked Adams's attorney: "Was there some agreement that he would be entitled to bond in [the separate and unrelated burglary] case pending his testimony here or not?" Pettus's attorney responded, "No, sir, there was no agreement on that. I don't know why . . . MDOC hasn't revoked him yet." The trial judge again asked, "But you know of no understanding that he's getting any kind of beneficial treatment there about delaying on the revocation because of this case?" Adams's attorney explained that he assumed that any beneficial treatment "would be communicated to me or through me on behalf of [Adams]."

¶40. Direct examination of Adams continued, and Adams admitted that in exchange for his plea deal in the present case, he agreed to testify against his codefendants.

¶41. During the cross-examination of Adams, the defense again asked the trial court to reconsider its ruling, arguing "that the [d]efense has the right to fully cross-examine the witnesses against the [d]efendant." Despite this argument, the trial court held that its ruling would remain the same.

¶42. On appeal, we find that the only rule of evidence that Pettus cites in support of his argument that he was improperly denied his constitutional right to fully cross-examine

17

Adams is Rule 607, which provides, "Any party, including the party that called the witness, may attack the witness's credibility." In his appellate brief, Pettus does not argue that under Rule 616 cross-examination of Adams was necessary to show the jury that Adams was biased in favor of testifying in the manner desired by the State. Instead, Pettus maintains that because he has a constitutional right to both fully cross-examine his accusers and assert his theory of defense, he was entitled to an opportunity to question Adams regarding Adams's subsequent arrests, especially in light of the State's theory that Pettus was the mastermind behind the crime and the one who encouraged his young, impressionable co-participants to commit the crime. Pettus argues that questioning Adams regarding his pending charges for other burglaries was also Pettus's attempt to assert his theory of defense: that he was not guilty of burglary.[6]

¶43. Upon review, we find that any error by the trial court in limiting Pettus's cross-examination of Adams was harmless beyond a reasonable doubt. *See Ambrose*, 254 So. 3d at 105 (¶70) ("Even errors involving a violation of an accused's constitutional rights may be deemed harmless beyond a reasonable doubt where the weight of the evidence against the accused is overwhelming."). The supreme court has held that such error was harmless beyond a reasonable doubt where even without the witness's testimony "[the appellant]'s guilt was proven beyond a reasonable doubt." *Id*. at 106 (¶73). Here, in addition to Adams's testimony, the jury also heard testimony from Tommy Stewart, as well as Pettus's additional

---

[6] The only mention of bias in Pettus's appellant brief, as it relates to the issue before us, is the following caselaw: "Trial courts are generally allowed wide discretion concerning the admission of evidence offered to suggest bias on the part of a witness against the defendant. *Tillis v. State*, 661 So. 2d 1139, 1142 (Miss. 1995)."

co-indictee Jemario Elmore, both of whom implicated Pettus in the crime. Elmore, like Adams, testified that he and Pettus (along with Tamodre Chamberlain) broke into the shed and removed items from the shed. Elmore testified that it was Pettus's idea to break into the shed. Elmore testified that after removing the items from the shed, they hid the items in some nearby woods.

¶44. Stewart testified a couple of days after the burglary, he received a phone call from Elmore asking him for a ride. Stewart drove to pick up Elmore, as well as Pettus, Adams, and Chamberlain. According to Stewart, he was instructed to drive down a back road near some woods. Once on the back road, Pettus, Adams, Elmore, and Chamberlain then exited Stewart's car and retrieved items from the woods. Stewart testified that he recalled these items to be two weed eaters and a chain saw. Stewart then took the items to a pawn shop, and Pettus negotiated what the items were worth and what Stewart would be paid for them. Stewart testified that once he received money for the items from the pawnshop owner, he gave the money to Pettus, who then gave Stewart "like [twenty] something dollars." Stewart testified that "at first," he did not know the items were stolen.

¶45. Investigator Maddox testified that when he interviewed Pettus, Pettus denied any involvement in the burglary and told Investigator Maddox that "he didn't do it."

¶46. After examining the factors discussed in *Clark*, 891 So. 2d at 142 (¶29), for determining whether a trial court committed reversible error in denying a defendant the opportunity to impeach a witness for bias, we find that Adams's testimony was cumulative to the testimony of Elmore and Stewart. We do find, however, that no physical evidence was

19

presented to corroborate the witnesses' testimony. Additionally, the record reflects that Stewart, Adams, and Elmore testified that they accepted plea deals in exchange for testifying against Pettus. As stated, the trial court instructed the jury that Adams, Stewart, and Elmore were admitted accomplices in the charged crime, and therefore "the jury should consider their testimony with great caution and suspicion." We recognize that "the jury will be the sole judge of the credibility of witnesses and the weight and worth of their testimony." *Parker v. State*, 962 So. 2d 25, 27 (¶12) (Miss. 2007).

¶47. Regarding Pettus's argument on appeal that Adams's testimony opened the door for further questioning involving his alleged criminal activity, "[t]his Court applies an abuse-of-discretion standard when a trial court decides 'whether a party opens the door for an opposing party to inquire about otherwise inadmissible evidence.'" *Robinson v. Corr*, 188 So. 3d 560, 572 (¶38) (Miss. 2016) (quoting *APAC-Mississippi Inc. v. Goodman*, 803 So. 2d 1177, 1185 (¶35) (Miss. 2002)) (other citation omitted). Furthermore, while "[a] criminal defendant is entitled to present his defense to the finder of fact, . . . [the defendant's] right to present his defense is limited by considerations of relevance and prejudice." *Hughey v. State*, 729 So. 2d 828, 831 (¶10-11) (Miss. Ct. App. 1998).

¶48. In the case before us, Pettus's counsel, not the State, asked Adams if he was the kind of person to break into a shed. Adams responded that he was not the type of person who would break into a shed. Our caselaw is clear that Pettus himself cannot open his own door to inadmissible character evidence. *See White v. State*, 228 So. 3d 893, 907 (¶38) (Miss. Ct. App. 2017); *Watson v. State*, 941 So. 2d 881, 883 (¶7) (Miss. Ct. App. 2006); *Watkins v.*

20

*State*, 874 So. 2d 486, 491 (¶25) (Miss. Ct. App. 2004).

¶49. After our review, we find no abuse of discretion by the trial court in preventing Pettus from questioning Adams about his subsequent criminal activity. Our review also shows no prejudice to Pettus as a result of this ruling. Pettus's counsel was able to cross-examine Adams about the circumstances regarding the burglary as well as Adams's plea deal with the State in that same matter. Pettus's counsel was also able to present his theory of defense that Pettus was not guilty of burglary.[7] The trial court also instructed the jury that Adams, as well as Stewart and Elmore, were admitted accomplices in the charged crime, and therefore "the jury should consider their testimony with great caution and suspicion."

¶50. We therefore affirm Pettus's conviction and sentence.

¶51. **AFFIRMED.**

**BARNES, C.J., GREENLEE, TINDELL, LAWRENCE AND C. WILSON, JJ., CONCUR. J. WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. McDONALD, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY WESTBROOKS AND McCARTY, JJ.**

**McDONALD, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶52. Although I concur in the result the majority reaches, I respectfully dissent from the majority's holding with respect to the *Batson* challenges. It appears to me that the trial court did not take the *Batson* challenge seriously, as evidenced by the following colloquy:

---

[7] During closing arguments, Pettus's counsel stated, "The truth is I don't know who broke into the shed and neither do you because none of us were there. And the two people that were there and admit to being there both said different things happened." Pettus's counsel also argued that Pettus has "maintained his innocence this entire time" and that "there's just not enough [evidence] in this case to convict" Pettus of burglary.

> BY MR. McNAIR: I hate to do this, but I'm going to make a *Batson* challenge. All five jurors that the State has struck are black, and all except for one are black females. And one, two, three of them gave no response, according to my notes.
>
> BY MS. COLEMAN: (for the State) I can - - I'm prepared to give answers if the Court wants to put those on the record.
>
> BY THE COURT: I think just - - I'm not sure that there's a presumption of bias. However, if you're willing to put that on the record considering the nature of the case, I think it would be prudent to do so. Have you got race-neutral reasons for all of the State's strikes? And I'll allow you to begin with Mr. Eades.

When only blacks or only whites are stricken, there is a presumption of bias: "[p]roof of systematic exclusion from the venire raises an inference of purposeful discrimination because the 'result bespeaks discrimination.'" *Batson v. Kentucky*, 476 U.S. 79, 94-95 (1986) (quoting *Hernandez v. Texas*, 347 U.S. 475, 482 (1954)).

¶53.    Justice King pointed out the following in his dissent in a recent case:

> At the outset, I note my concerns that this Court uses the deferential standard of review used in *Batson* cases as a shield to avoid holding prosecutors and trial courts accountable. A deferential standard of review is not (and should not be) a rubber stamp on trial court decisions; yet, that is how this Court has wielded it in *Batson* cases. And prosecutors seem adept at making increasingly better excuses for striking African-American jurors, actions for which this Court has shown no interest in holding the State accountable.
>
> The United States Supreme Court's decision in *Batson* was "founded upon the realities that substantial and invidious racial discrimination was being practiced in jury selection, and that this was a state-sponsored sin." *Davis v. State*, 551 So. 2d 165, 176 (Miss. 1989) (Robertson, J., concurring). Since *Batson* was decided, this Court has reviewed approximately 117 cases for race-based, substantive *Batson* issues. Of those cases, 105 involved strikes of African-American jurors and fifteen involved strikes of white jurors. Of the cases involving strikes of African-Americans in which the trial court found no *Batson* violation, this Court affirmed the trial court's findings in one hundred

22

of those cases and reversed the trial court in five of those cases. Of the thirteen cases in which the trial court found a *Batson* violation for the strike of white jurors, this Court affirmed the trial court eleven times and reversed it twice. This Court affirmed the two cases in which the trial court found no *Batson* violation for striking of white jurors. These numbers paint a troubling picture of this Court's willingness to allow prosecutors to exclude black jurors from jury service. And five reversals are certainly nothing to herald.

*Eubanks v. Mississippi*, No. 2018-KA-00282-SCT, 2020 WL 948314, at *11 (¶¶62-63) (Feb. 27, 2020) (King, J., dissenting) (appendix A and footnotes omitted).

¶54. There is no question that Pettus made a prima facie case of discrimination pursuant to the three-prong *Batson* test. The State then offered supposedly race-neutral reasons for using its peremptory strikes on potential jurors. The transcript indicates that concerning potential Juror 1, State argued that

> she actually gave absolutely no comment. With her being the first juror, certainly she's one of the few that I tried to maintain eye contact with. She was yawning. She was staring at the wall that's to her left when we were in there. I just did not feel like she was listening or paying attention, or maybe she just didn't like me. But that would be my race-neutral reason.

Other reasons given for striking other jurors included her looking "as if she may have had an eye issue"; an unknown but possible familial relationship with recently convicted persons who had the same last name; and general non-responsiveness. Often there were no questions asked to determine if these "reasons" were mere speculations or actual facts.

¶55. For these reasons I disagree with the majority's discussion of the *Batson* challenges.

**WESTBROOKS AND McCARTY, JJ., JOIN THIS OPINION.**